E-FILED
Tuesday, 28 February, 2012  08:40:18 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **WARNETHER A. MUHAMMAD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 09-2172** |
| | ) | |
| **CATERPILLAR, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

This case is before the court for ruling on the Motion for Summary Judgment (#31) filed by the Defendant, Caterpillar, Inc, and the Motion to Strike (#35) filed by the Plaintiff, Warnether A. Muhammad.  This court has carefully reviewed the arguments and supporting documents filed by the parties.  Following this careful and thorough review, Plaintiff's Motion to Strike (#35) is DENIED, and Defendant's Motion for Summary Judgment (#31) is GRANTED.

## FACTS[1]

## I.  EMPLOYMENT AT CATERPILLAR

Plaintiff has been, and currently is, an employee of Defendant Caterpillar, Inc. ("Caterpillar").  Plaintiff was initially hired by Caterpillar at its Decatur facility in August, 2005.  During 2006, Plaintiff worked as an assembler on the wheel tractor scraper line—a

---

[1]The facts are taken from the parties' statements of undisputed facts and the documents submitted by the parties.  This court has only included facts which are adequately supported by evidence in the record.

role where Plaintiff worked as a member of a team to assemble portions of the wheel tractor scraper.  Plaintiff's hours in 2006 were from 3:00 p.m. to 11:00 p.m., including breaks at 5:00, 7:00 and 9:00 p.m.  Other members of Plaintiff's team were Cindy Bond ("Bond"), Rob Boriff ("Boriff") and Val Bridges ("Bridges"), among others.  Initially, Plaintiff did not have any issues with these particular employees and trusted them as members of his team.

At some point in July or August of 2006, Kipp Edwards ("Edwards") took over as Plaintiff's supervisor.  The group manager for Plaintiff's shift was Boyd Johnson ("Johnson").  Melissa Schwoerer ("Schwoerer") was the labor relations representative responsible for investigating employee complaints and disciplinary problems at the Decatur facility.  Plaintiff's Amended Complaint (#14) solely involves issues that started after Edwards became Plaintiff's supervisor and continued through January 8, 2007 when Plaintiff was terminated from Caterpillar.  Although Plaintiff was eventually rehired by Caterpillar, his subsequent employment with Caterpillar is not relevant to Plaintiff's claims in this case.

Caterpillar has a Prohibited Harassment Policy ("Policy") that prohibits harassment based upon sexual orientation, race, color and gender.  Caterpillar regularly trains its workforce on this Policy and it is readily accessible to employees.  This Policy was in place throughout the relevant time period in 2006 and 2007.  Employees are made aware of the proper procedure for reporting conduct that violates the Policy.  Plaintiff, upon his initial hire with Caterpillar, received and signed the Policy.

2

## II.  COWORKER HARASSMENT

### A.  *Instances of Verbal Harassment*

The first instance of alleged coworker harassment occurred in May, 2006.  Plaintiff reported to human resources that Smitty Dole ("Dole") called him a "black n----r" and could not understand how Plaintiff was able to obtain his job.  After Plaintiff's complaint to human resources, Dole never made any further racial comments to Plaintiff.

At some point in July or early August, 2006, Plaintiff reported to his supervisor, Edwards, that he was having trouble with a coworker, Mark Boem ("Boem").  Plaintiff reported that Boem called him a "black fag--t a--" because Boem believed Plaintiff had got Dole in trouble.  Edwards told Plaintiff that he would take the complaint about Boem to human resources, which Edwards did.  Although it is unclear what punishment Boem received, it is undisputed that Plaintiff never had any problems with Boem after Plaintiff's conversation with Edwards.

In September, 2006, Cynthia Bond ("Bond") made a statement to Plaintiff that she did not like her grandchildren because they were black.  Additionally, Bond stated that she wished her daughter had dated a white man, not a black man.  Plaintiff reported these comments to Edwards who then sent Bond and Plaintiff to human resources to discuss the statements.  Later, in October 2006, after Plaintiff had been suspended for a brief period, Bond made a comment to Plaintiff that "his black butt should have stayed fired."  Plaintiff did not report this comment to Edwards or human resources.

B.  *Harassment in form of Graffiti*

In early August, 2006, Plaintiff was informed that his name was on the wall of the bathroom.  Plaintiff viewed the graffiti which stated the following: (1) "[Plaintiff] has AIDS and [Plaintiff] is a fag, a know-it-all fag" and (2) "[Plaintiff] is a black n----r and [Plaintiff] should be killed."  On August 11, 2006, Plaintiff reported this graffiti to Edwards, who immediately contacted NuAir (a third-party provider of painting services) to have the graffiti painted over.  Edwards also reached out to Johnson and Schwoerer for guidance on how to deal with this situation.  On August 14, 2006, the graffiti reappeared and Plaintiff reported it to Edwards.  During Plaintiff's conversation with Edwards, in an apparent attempt to empathize with Plaintiff, Edwards stated that he also had graffiti about him on the wall.  Plaintiff interpreted this statement to mean that Edwards did not care about the graffiti.  Nevertheless, Edwards once again called NuAir to paint over the graffiti.  After Plaintiff spoke with Edwards about the reappearance of the graffiti, Plaintiff also spoke with Johnson.  Johnson looked at the graffiti and did confirm that there were statements about Plaintiff's sexual orientation, but did not see any racial graffiti.

On August 30, 2006, Edwards noticed that there was additional graffiti relating to the Plaintiff and therefore he emailed Diane Endrizzi ("Endrizzi") and employee relations manager John Huber ("Huber"), and copied superintendent Dave Korowicki ("Korowicki").  In this email, Edwards explained that although the graffiti had been painted over on three occasions already, and that he had addressed the graffiti in his shift start meetings, the graffiti continued to reappear.  Edwards then asked for guidance as to how to ensure that the

4

situation was dealt with properly.  At this point, Huber recommended that Edwards speak to each employee in the building in a one-on-one meeting.  Accepting this recommendation, Edwards, along with Korowicki and Johnson, spoke with every employee on the line and made it known that the graffiti would not be tolerated and that if anyone was caught, they would be immediately terminated.  After these individual meetings were conducted, the graffiti never reappeared.  No Caterpillar employee was ever found to be responsible for the graffiti, and the parties dispute the level of investigation that Defendant undertook to discover who was actually responsible for the graffiti.[2]

### III.  PLAINTIFF'S FIRST SUSPENSION

On October 12[3], 2006, Plaintiff was away from his work station using the restroom and looking at the job bid board[4] during work time.  After Edwards discovered that Plaintiff was away from his work station, there was a confrontation between Edwards and Plaintiff.  Edwards recorded his interpretation of the incident in an incident report.  Although the facts relating to this incident are in dispute,[5] it is undisputed that Edwards gave Plaintiff an

---

[2]Defendant offered a declaration by Johnson that he, along with shift supervisors, watched to see who entered the men's bathroom to see if they could catch the perpetrator, but were unsuccessful.  Plaintiff disputes that this occurred, because he personally was not aware that it was occurring.

[3]The date of this incident is not consistent throughout the materials submitted by the parties.  Nevertheless, as the date is not material for purposes of this opinion, this court will use this date as the date of Plaintiff's first suspension.

[4]The bid board is apparently a location where Defendant lists open positions.

[5]Plaintiff claims he was told by Edwards that he was being suspended for performance issues.  Edwards, along with other witnesses to the incident, claim that Plaintiff walked away from Edwards after Edwards attempted to discuss Plaintiff's absence from his work area.

indefinite suspension for insubordination as a result of the incident and personally walked Plaintiff out of Defendant's plant.

At some point prior to October 2006, Plaintiff was asked to complete a survey regarding Edwards.  In his survey response, Plaintiff included constructive criticism about Edwards.  Plaintiff believes, based on later interaction with Edwards, that Edwards was angry with him for making these comments.  Additionally, Plaintiff alleges that Edwards was upset with him for speaking to Johnson about the graffiti.  Plaintiff believes that this was the motivation for Edwards to retaliate against him by suspending him.

After the incident between Edwards and Plaintiff, Schwoerer, the labor relations representative, spoke with Edwards about the incident.  Based on Defendant's internal protocol, Edwards did not possess the authority to determine the severity of discipline for any incidents of misconduct.  Rather, Edwards was only able to suspend employees pending an investigation of the misconduct by Defendant's labor relations representatives.  After this discussion with Schwoerer, Edwards had no further involvement in Plaintiff's discipline. Schwoerer discussed this incident with labor relations manager Hubert, and a determination was made on October 24, 2006, that a suspension for insubordination was appropriate.  At some point prior to November 2, 2006, Plaintiff was contacted by Schwoerer who instructed him that he could return to work on November 2, 2006, which he did.

Plaintiff admits that he has never seen other Caterpillar employees: (1) refuse to do work when asked by a supervisor or (2) walk away from a supervisor while the supervisor was talking to them.  Additionally, Plaintiff does not believe, and offers no evidence, that

6

anyone at Caterpillar, other than Edwards, retaliated against him.  Specifically, Plaintiff

acknowledges that he does not believe that Schwoerer or Johnson had any discriminatory

intent or views regarding the Plaintiff at any time.

## IV.  PLAINTIFF'S SECOND SUSPENSION

After Plaintiff returned to work on November 2, 2006, Plaintiff had difficulties with

some of his coworkers.[6]  Apparently, these coworkers did not want to work with the Plaintiff.

Despite these issues, Plaintiff did not make any complaints to human resources.  On

November 15, 2006, after receiving complaints from numerous individuals, Edwards sent an

email to Endrizzi indicating that three employees were having difficulties working with

Plaintiff—specifically Bond, Boriff and Bridges.  After receiving this email, Endrizzi sent an

email to Hubert, asking for guidance.  Hubert sent an email to Schwoerer and requested that

Schwoerer conduct interviews with the Plaintiff and the three employees.

Schwoerer explained that, in their interviews with Schwoerer, Plaintiff's coworkers

reported numerous problems with Plaintiff.  Specifically, they reported that: (1) Plaintiff

became defensive when informed that he had torqued bolts with the wrong gun; (2) Plaintiff

refused to assist team members in correcting improperly torqued bolts; (3) Plaintiff

repeatedly yelled and cursed at his coworkers when Plaintiff's mistakes were pointed out; (4)

Plaintiff made comments such as "I'll kill you f---ers" and that he "would kill people if not

for his daughter;" and (5) Plaintiff was acting oddly during work time and not working with

his coworkers.  After meeting with Plaintiff's coworkers, Schwoerer then met with the

---

[6]For instance, as discussed above, Bond told him that his "black butt should have
stayed fired."

Plaintiff to discuss his alleged difficulties working with his coworkers.  Although it is unclear what exactly was said during this meeting, Plaintiff and Schwoerer discussed the incidents that his coworkers had complained about and the relationship between Plaintiff and his coworkers.  Plaintiff denied that he had yelled or swore at his coworkers.  Plaintiff admits that he is not aware of other Caterpillar employees that have been reported to the human resource department for swearing at a coworker.

After conducting these interviews, Schwoerer directed Edwards to walk Plaintiff out of the plant and place him on indefinite suspension.  Schwoerer made this decision based on her concerns over Plaintiff's alleged threats to coworkers.  Schwoerer then consulted with labor relations manager Hubert regarding Plaintiff's situation.  After this consultation, Schwoerer made the decision to terminate Plaintiff based on: (1) his alleged threats to kill coworkers; (2) his swearing at coworkers when they made comments to him about work errors; and (3) his repeated failure to perform work during his work time.[7]  Edwards lacked the authority to make a decision to terminate or otherwise impose discipline on an employee, and was not involved in any manner in the decision making process to terminate Plaintiff's employment.  Edwards' only involvement in Plaintiff's second suspension was escorting Plaintiff out of the plant at the direction of Schwoerer.

---

[7]Importantly, this list of reasons for Plaintiff's termination was included on Defendant's list of undisputed material facts.  In responding to this fact (and many others), Plaintiff stated: "This fact [is] outside the knowledge of plaintiff and therefore should not be listed as uncontested."  This objection is insufficient to create a genuine issue of material fact.  See, e.g., Salvadori v. Franklin Sch. Dist., 293 F.3d 989, 992 (7th Cir. 2002).  Local Rule 7.1(D)(2)(b)(2) provides that: "[e]ach claim of disputed fact must be supported by evidentiary documentation referenced by specific page."  Plaintiff's response failed to follow the local rules and is insufficient to create a genuine issue of material fact.

After Plaintiff's indefinite suspension on November 16, 2006, a union grievance process was initiated.  On January 8, 2007, while continuing on indefinite suspension, Plaintiff was terminated by Caterpillar.  Eventually, Plaintiff returned to work at Caterpillar on July 1, 2008 with no back pay.  Plaintiff was then laid off in a reduction-in-force on April 23, 2009, but later returned to Caterpillar voluntarily when a position became available.

## PROCEDURAL BACKGROUND

On March 12, 2007, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  On June 30, 2009, Plaintiff received a Notice of Right to Sue from the EEOC.  On July 17, 2009, Plaintiff filed a pro se Complaint (#1) against the Defendant.  On September 22, 2009, an attorney entered an appearance on the Plaintiff's behalf.  On December 1, 2009, Plaintiff filed an Amended Complaint (#14) alleging that he was subjected to a hostile work environment based on his race and sexual orientation and that he suffered retaliation for reporting the harassment to his supervisors. Defendant filed its Answer (#15) on December 3, 2009.

On November 14, 2011, Defendant filed a Motion for Summary Judgment (#31) and attached supporting exhibits.  On January 5, 2012, Plaintiff filed a Response (#36) to the Motion for Summary Judgment and a Supporting Memorandum (#37).  Also, Plaintiff filed a Motion to Strike (#35) various declarations that were submitted by Defendant to support its Motion for Summary Judgment (#31).  On January 17, 2012, Defendant filed a Response (#39) to Plaintiff's Motion to Strike (#35).  On January 26, 2012, Defendant filed its Reply (#40) in support of its Motion for Summary Judgment.

## ANALYSIS—MOTION TO STRIKE (#35)

As an initial matter, this court must address Plaintiff's Motion to Strike (#35) various declarations that were submitted by Defendant to support its Motion for Summary Judgment (#31).  Plaintiff argues that this court should strike declarations on the basis that these unsworn declarations were not executed in the appropriate manner.  Defendant, in its Response (#39), not only contested the merits of the rationale for striking the declarations, but also provided new declarations in the manner requested by the Plaintiff—thus, the request to strike the declarations is denied.  Additionally, Plaintiff further requests that this court strike portions of Schwoerer's declaration and the attached exhibits, arguing that they are hearsay.  This court agrees with Defendant's response that there is no basis for Plaintiff's objections to Schwoerer's declaration or exhibits.  Therefore, Plaintiff's Motion to Strike (#35) is DENIED.

## ANALYSIS—MOTION FOR SUMMARY JUDGMENT (#31)

### I.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  In making this determination, the court must construe the evidence in the light most favorable to the

nonmoving party and draw all reasonable inferences in favor of that party.  See Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Burwell v. Pekin Cmty. High Sch. Dist. 303,
213 F. Supp. 2d 917, 929 (C.D. Ill. 2002).  Speculation, however, is not the source of a
reasonable inference.  See Burwell, 213 F. Supp. 2d at 929 (citing Chmiel v. JC Penney Life
Ins. Co., 158 F.3d 966, 968 (7th Cir. 1998)).

Therefore, the nonmoving party cannot rest on mere allegations or denials to
overcome a motion for summary judgment; "instead, the nonmovant must present definite,
competent evidence in rebuttal."  Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th
Cir. 2004).  Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party
must show what evidence it has that would convince a trier of fact to accept its version of
events."  Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1111 (7th Cir. 2004).
Specifically, to survive summary judgment, the nonmoving party "must make a sufficient
showing of evidence for each essential element of its case on which it bears the burden at
trial."  Kampmier v. Emeritus Corp., 472 F.3d 930, 936 (7th Cir. 2007), citing Celotex Corp.,
477 U.S. at 322-23.  Conclusory allegations not supported by the record are not enough to
withstand summary judgment.  Basith v. Cook Cnty., 241 F.3d 919, 928 (7th Cir. 2001).

Nevertheless, uncorroborated testimony from the non-movant, even if self-serving,
can be evidence of disputed material facts and therefore prevent summary judgment, as long
as such testimony is based on personal knowledge or firsthand experience.  Berry v. Chicago
Transit Auth., 618 F.3d 688, 691 (7th Cir. 2010).  Moreover, "[i]t is not for courts at

summary judgment to weigh evidence or determine the credibility of [a witness's] testimony; we leave those tasks to factfinders."  Id.

## II.  GENDER HARASSMENT & RETALIATION CLAIMS

Under Title VII of the Civil Rights Act of 1964, an employer is prohibited from harassing an employee "because of [the employee's] sex."  42 U.S.C. § 2000e-2(a)(1).  The Seventh Circuit explained, however, that harassment is only actionable "to the extent that it occurs because of the plaintiff's sex."  Spearman v. Ford Motor Co., 231 F.3d 1080, 1084 (7th Cir. 2000).  Specifically, in considering a claim of same-sex sexual harassment based on the plaintiff's sexual orientation, the Seventh Circuit explained as follows:

> We have stated that "the phrase in Title VII prohibiting discrimination based on sex" means that "it is unlawful to discriminate against women because they are women and against men because they are men."  In other words, Congress intended the term "sex" to mean "biological male or biological female," and not one's sexuality or sexual orientation.  Therefore, harassment based solely upon a person's sexual preference or orientation (and not on one's sex) is not an unlawful employment practice under Title VII.

Id. (Citations omitted).  In this case, Plaintiff claims of gender discrimination are based solely on comments relating to his sexual orientation—**not** relating to the fact that he is a biological male.[8]  Therefore, although the comments about Plaintiff's sexual orientation are certainly inappropriate, they are not actionable under Title VII under clear Seventh Circuit precedent.

---

[8]Plaintiff has not countered the fact that he is not claiming gender discrimination on the basis that he is a biological male.  In fact, Plaintiff readily acknowledged in his Response (#37) that he "was subjected to unwelcome[] conduct of a sexual nature and the conduct was directed at him because of his perceived sexual orientation."

Additionally, any claim of retaliation based on Plaintiff's complaints of his coworkers comments cannot be based on these sexual orientation related statements.  In <u>Spearman</u>, the Seventh Circuit explained that the plaintiff's claim of retaliation failed because the complaints of coworker abuse made to the employer "did not involve an unlawful employment practice under Title VII," as required to establish a successful claim of retaliation under Title VII.  <u>Spearman</u>, 231 F.3d at 1086 n.5.  Therefore, Plaintiff's claims based on gender harassment or retaliation for reporting gender harassment fail as a matter of law.

### III.  RACIAL HARASSMENT

Harassment, if it is "sufficiently severe or pervasive to alter the conditions . . . of employment," is actionable under Title VII.  <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986).  In order for a plaintiff to survive a motion for summary judgment, an employee making a claim of racial harassment must demonstrate: "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability."  <u>Williams v. Waste Mgmt. of Ill., Inc.</u>, 361 F.3d 1021, 1029 (7th Cir. 2004).  Although Defendant concedes that Plaintiff was subject to unwelcome harassment and that some of the harassment was based on Plaintiff's race, Defendant argues Plaintiff is unable to satisfy the third and fourth elements.

### A.  Severity and Pervasiveness of Harassment

The Seventh Circuit has explained that a workplace must be "one that is hellish" to be actionable under Title VII.  Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997).  The Supreme Court has explained that the determination of whether a work environment is hostile or abusive must be determined by looking at all of the circumstances, specifically including:

> [T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  Additionally, the Supreme Court has explained that the "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." Id. at 21 (internal citations and quotation omitted).  In considering whether comments create a environment sufficiently hostile to be offensive, courts often consider whether the alleged offensive comments were made in the presence of the plaintiff and directed at the plaintiff. See, e.g., McPhaul v. Bd. of Comm. of Madison County, 226 F.3d 558, 567 (7th Cir. 2000); Ngeunjuntr v. Metropolitan Life Ins. Co., 146 F.3d 464, 467 (7th Cir. 1998) (emphasizing that most of the offensive racial comments were isolated and not actually directed at the plaintiff and therefore did not create a sufficiently hostile environment).  Also, there is no bright line rule requiring a certain number of incidents of offensive behavior for a court to find that there was a hostile environment.  Hostetler v. Quality Dining, Inc., 218 F.3d 798, 808 (7th Cir. 2000) ("Harassment need not be severe and pervasive to impose liability; one or

14

the other will do. . . . There is no 'magic' number' of incidents required to establish a hostile environment.").

In this case, Plaintiff alleges that he was subject to unwanted racial harassment five different times: (1) coworker Dole called him a "black n----r" in May, 2006; (2) coworker Boem told Plaintiff he did not like his "black fag--t a--" in July, 2006; (3) coworker Bond told Plaintiff that she did not like that her daughter dated and had children with a black man; (4) Bond also told Plaintiff that his "black butt should have stayed fired;" and (5) graffiti was written on the wall that Plaintiff was a "black n----r and should be killed" in August, 2006. Each of these comments made by Plaintiff's coworkers are completely unacceptable. Moreover, each of the comments were directed at the Plaintiff.  Nevertheless, this court finds that the first four comments, by themselves, are too isolated and not severe enough to establish a hostile work environment.  However, the graffiti that stated that Plaintiff "should be killed" is sufficiently severe by itself to establish a hostile environment.  Therefore, although the majority of the comments that Plaintiff complains of were merely offensive utterances, the threatening graffiti is sufficient to support a finding that Plaintiff's work environment was hostile for purposes of summary judgment.

**B.  Basis for Employer Liability**

An employer is not strictly liable for racial harassment perpetrated by its employees. See, e.g., Porter v. Erie Foods Int'l, Inc., 576 F.3d 629, 636 (7th Cir. 2009).  Where a plaintiff's claim of racial harassment is based solely on harassment by coworkers, as it is in this case, the plaintiff must demonstrate that the employer was "negligent either in

15

discovering or remedying the harassment." <u>Williams</u>, 361 at 1029 (citations omitted).  An employer can avoid liability for coworker harassment "if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." <u>Porter</u>, 576 F.3d at 636.  In this case, Plaintiff does not allege that Caterpillar was negligent in discovering the alleged harassment, therefore this court will focus solely on the question of whether Defendant took appropriate corrective action after discovering each incident of racial harassment.

The first incident of racial harassment occurred when coworker Dole called Plaintiff a "black n----r" in May, 2006.  Plaintiff reported Dole's comment to human resources. Although it is not clear from the facts before this court, it appears that human resources suggested that Plaintiff and Dole stay away from each other.  It is not clear what interaction the human resources had with Dole after Plaintiff's report, however, as part of Plaintiff's other claims, it appears that he believed Dole did get in trouble.  Nevertheless, although the remedial action in this situation is not clear, it is undisputed that Dole never made any other racial comments to Plaintiff, therefore the action Defendant took was effective.  <u>See</u> <u>Adler v. Wal-Mart Sores, Inc.</u>, 144 F.3d 664, 676 (10th Cir. 1998) ("[S]toppage of harassment shows effectiveness . . . .").

The second incident of racial harassment occurred when coworker Boem called Plaintiff a "black fag--t a--" in late July or early August, 2006.  Plaintiff reported this comment to Edwards, who told Plaintiff that he would take the complaint to human resources, which Edwards did.  Once again, it is unclear what remedial action was taken by

16

human resources, however it is undisputed that Boem never made any racial comments to Plaintiff.  Therefore, the action Defendant took was effective, even if the result was unsatisfying to the Plaintiff, who believed punishment was appropriate.

The third incident of racial harassment occurred in September, 2006, when coworker Bond made statements to Plaintiff that she did not like her grandchildren because they were black and that she wished her daughter had dated a white man, not a black man.  Plaintiff reported the conduct to Edwards who then sent Bond and Plaintiff to human resources to discuss the statements.  Plaintiff was unable to remember the discussion that took place with human resources.  In this particular incident, this court believes a discussion with Plaintiff and Bond was an appropriate response.  Because Bond's statements, although inappropriate, were not severe or threatening, it was reasonable for Defendant to conduct a discussion with the two coworkers to try to address the concern.  Plaintiff does not complain that Defendant failed to do enough to stop Bond's "harassment" in this particular instance.

The fourth incident occurred in October, 2006, when Bond made a comment to Plaintiff that "his black butt should have stayed fired."  Plaintiff did not report this comment to his supervisors or to human resources.  Therefore, because an employer generally does not have any liability for a comment made by a coworker of which it has no knowledge, there is no basis to find any basis to find Defendant liable for failing to respond to this comment.  See Silk v. City of Chicago, 194 F.3d 788, 807 (7th Cir. 1999).

Finally, and most importantly, the fifth incident of racial harassment involved graffiti written on the bathroom wall in August, 2006, that Plaintiff was a "black n----r and should be

killed."  After reading this material, Plaintiff reported the graffiti to Edwards, who immediately contacted NuAir (a third-party provider of painting services) to have the graffiti painted over.  Edwards also reached out to Johnson and Schwoerer for guidance of how to deal with this situation, and addressed the graffiti in shift start meetings.  Despite these actions, new comments reappeared only a few days after the bathroom wall was repainted, although they were not racial, but were sexual orientation based.  Each time these comments reappeared, the graffiti was painted over within a period of days.

Finally, after sexually explicit comments reappeared on August 30, 2006, Edwards emailed Endrizzi, employee relations manager Huber and superintendent Korowicki.  In this email, Edwards explained that although the graffiti had been painted over on three occasions already, and that he had addressed the graffiti in his shift start meetings, the graffiti continued to reappear.  Edwards then asked for guidance of how to ensure that the situation was dealt with properly.  At this point, Huber recommended that Edwards speak to each employee in the building in a one-on-one meeting.  Accepting this recommendation, Edwards, along with Korowicki and Johnson, spoke with every employee on the line and made it known that the graffiti would not be tolerated and that if anyone was caught, they would be immediately terminated.  Although these individual meetings with every employee did not result in discovering the individual(s) responsible for the graffiti, there is no dispute that the graffiti never reappeared.  Therefore, in under one month from the time that graffiti was discovered about the Plaintiff, Defendant was able to prevent the graffiti from reappearing.  Given the

private nature of the bathroom, and the inherent difficulty in catching a perpetrator red-handed in such a private location, the actions that Defendant took were reasonable.

Additionally, although this court explained that the graffiti stating that Plaintiff was a "black n----r and should be killed" by itself was threatening enough to establish a hostile work environment, this court does not believe that any further action by the Defendant was necessary when it learned of this particular graffiti. Based on Plaintiff's deposition, it does not appear that he actually felt threatened by this graffiti. Importantly, in Plaintiff's Response (#37), Plaintiff did not even refer to the "should be killed" graffiti in explaining why the racial discrimination was severe. This leads the court to the conclusion that Plaintiff did not actually believe that his life was in danger. Perhaps, if the graffiti stated: "Plaintiff will be killed" or "Plaintiff should watch his back", simply painting over the graffiti and reminding employees about the harassment policy would not have been insufficient. However, that is not the case here. Plaintiff makes no allegations that he actually feared for his safety or informed his supervisors that he feared for his safety. If Plaintiff had been concerned with his safety, a more aggressive response might have been necessary. In conclusion, this court finds that Defendant's actions, even thought the perpetrator was not caught, were reasonable given the nature of the graffiti and Plaintiff's concerns regarding the graffiti.

## IV. RETALIATION CLAIM

Employers are prohibited from retaliating against an employee for complaining about discrimination that violates Title VII. 42 U.S.C. § 2000e-3(a). A *prima facie* case of

retaliation may be satisfied using either the direct method or indirect method.  Stephens v.
Erickson, 569 F.3d 779, 786 (7th Cir. 2009).  Plaintiff, in his Response (#37), only argued
that he was able to establish retaliation under the direct method.  Therefore, this court will
not consider the indirect method.[9]  As an initial matter, based on the Plaintiff's Response and
the undisputed facts in this case, it appears that Plaintiff is only alleging retaliation for his
initial suspension.  Specifically, it is undisputed that: (1) Plaintiff only alleges that Edwards
retaliated against him; and (2) Edwards was not involved in Plaintiff's second suspension and
subsequent termination—rather, the decision to suspend Plaintiff on November 16, 2006 was
made solely by Schwoerer and labor relations manager Hubert.  Morever, Plaintiff's
Response (#37) acknowledges that Plaintiff believes his coworkers, not any decision maker
of the Defendant, were responsible for his second suspension and termination:

> But when the employees, who likely were the same employees who repeatedly
> harassed him with graffiti, complained about [Plaintiff], the employees were called in
> one by one so that HR could explore their feelings about [Plaintiff] and, ultimately,
> based on their complaints, indefinitely suspend him, and then fire him.  In essence,
> [Plaintiff] was twice victimized by employees who worked under [Edward's]
> supervision.  And they accomplished what they could not do with the graffiti, they got
> him fired.

This concession that his coworkers were responsible for his second suspension, as well as the
undisputed fact that Edwards was not involved in his second suspension, make it clear that

---

[9]Even if Plaintiff had advanced an argument under the indirect method, it would have
been futile as the Defendant convincingly explained that, based on the undisputed facts, the
Plaintiff: (1) cannot demonstrate that he performed his job according to Defendant's
legitimate performance expectations at the time of his suspensions; (2) has failed to identify
any similarly situated employees who did not suffer similar adverse actions by the
Defendant; and (3) is unable to show that Defendant's stated reasons for his suspensions
were pretextual.

any claim of retaliation based on Plaintiff's suspension on November 16, 2006 and his

subsequent termination fails.  See, e.g., Rogers v. City of Chicago, 320 F.3d 748, 754 (7th

Cir. 2003) ("[U]nder the direct method a plaintiff must provide direct or circumstantial

evidence that the *decisionmaker* has acted for a prohibited reason. A decisionmaker is the

person 'responsible for the contested decision.'").  Therefore, this court will solely focus on

whether Plaintiff can establish a claim of direct retaliation based on Edwards' decision to

indefinitely suspend Plaintiff on October 12, 2006.

Plaintiff has claimed that he was retaliated against by Edwards when he was

indefinitely suspended on October 12, 2006.[10]  To satisfy the direct method of a retaliation

claim, the plaintiff must present direct evidence that: (1) he engaged in a statutorily protected

activity; (2) an adverse action was taken by his employer; and (3) there was a causal

connection between the activity and the adverse action.  Id.  Defendant does not dispute that

Plaintiff engaged in statutorily protected activity when he reported the racially motivated

bathroom graffiti to Edwards, and later to Johnson.  Additionally, it is undisputed that an

adverse employment action was taken by the Defendant.  However, Defendant argues that

Plaintiff has not offered any direct evidence that there was a causal connection between

---

[10]Importantly, Plaintiff offered the following fact in his statement of undisputed
material facts: "Plaintiff believes Edwards suspended him in October 2006, because he went
over his head and complained to Boyd Johnson about **sexual harassment**." (emphasis
added).  As this court discussed earlier, retaliation for conduct that is not protected under
Title VII, such as complaints of harassment based on sexual orientation, is not actionable.
Nevertheless, out of an abundance of caution, this court will address Plaintiff's retaliation
claims, because some of the graffiti complained of was race related.

Plaintiff's report of the bathroom graffiti to Edwards and Johnson and Edwards' decision to

indefinitely suspend Plaintiff.

Under the direct method, Plaintiff may establish a causal connection using either

direct or circumstantial evidence.  Stephens, 569 F.3d at 787.  Direct evidence, in the context

of retaliation, generally requires an admission by the decision maker of the impermissible

animus.  Id.; Nagle v. Village of Calumet Park, 554 F.3d 1106, 1114 (explaining that direct

evidence "usually requires an admission from the decisionmaker about his discriminatory

animus, which is rare indeed . . . .").  Alternatively, a plaintiff may prevail under the direct

method "by constructing a convincing mosaic of circumstantial evidence that allows a jury to

infer intentional discrimination by the decisionmaker."  Id. (quoting Rhodes v. Ill. Dep't of

Transp., 359 F.3d 498, 504 (7th Cir. 2004).  In this case, there is no admission from Edwards

that he suspended Plaintiff because of Plaintiff's decision to report the graffiti to Johnson.

Therefore, the only question under the direct method is whether there is a "convincing

mosaic of circumstantial evidence."

Plaintiff offers the following as circumstantial evidence of retaliation: (1) Plaintiff's

suspension was close in proximity to his decision to report the graffiti to Johnson; (2)

Plaintiff alleges that Edwards told him that by reporting the graffiti to Johnson, Plaintiff

failed to follow the proper protocol for making a report; and (3) Plaintiff believes the stated

reason for his suspension—insubordination—was insufficient to justify a suspension.

As a general rule, the Seventh Circuit has explained that the "mere temporal proximity

between the filing of the charge of discrimination and the action alleged to have been taken

in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue."
Stone v. City of Indianapolis Public Utilities Div., 281 F.3d 640, 644 (7th Cir. 2002).  In this
case, Plaintiff's complaints of racial harassment primarily occurred during August, 2006.
The Plaintiff's initial suspension occurred on October 12, 2006.  These dates are relatively
close in time, however, by itself, this is not convincing that Edwards' motivation for
suspending Plaintiff was retaliation.

Therefore, this court must consider the other two additional circumstances that
Plaintiff argues supports an inference of retaliation.  First, Plaintiff alleges that Edwards told
him that by reporting the graffiti to Johnson, Plaintiff failed to follow the proper protocol for
making a report.  Although this statement possibly would support an inference that Edwards
believed Plaintiff was out of line for reporting the graffiti to Johnson, and therefore was upset
with Plaintiff because Edwards might have been criticized by his superiors for failing to
adequately deal with the graffiti—other undisputed evidence demonstrates otherwise.
Specifically, it is undisputed that Edwards had reported the graffiti to Johnson and Schwoerer
and sought guidance from the beginning.  Therefore, any inference that Edwards was
possibly scolded or criticized by his superiors and as a result was upset with Plaintiff is
significantly weakened.  Moreover, even as alleged, the statement itself was not made in a
critical manner but simply was an explanation by Edwards of the appropriate protocol for
reporting discrimination.

Finally, Plaintiff argues that the stated reason for his suspension—insubordination—
was insufficient to justify a suspension, therefore there is a permissible inference of

retaliation.  Plaintiff challenges this justification on the basis that he did not really walk away

from Edwards and that Edwards should not have been upset with him for using the bid board

in the first place.  From Plaintiff's Response (#37), it seems clear that even if Plaintiff did not

walk away from Edwards, he certainly was unwilling to discuss the incident with Edwards.

Specifically, Plaintiff's Response states:

> Edwards stated that it was because [Plaintiff] walked away from him when he was
> discussing his absence from his work station.  But [Plaintiff] wanted a Union Steward
> to be present because he feared disciplinary action would be discussed.

This statement actually seems to concede that Plaintiff was challenging Edward's authority.

Therefore, because there is no dispute that: (1) Plaintiff actually was away from his work

station during his work time, and (2) there was some level of confrontation about whether or

not Plaintiff should have been away from his work station, any argument that insubordination

was an insufficient reason for a suspension is significantly weakened.  Therefore, this court

finds that any inference that retaliation was Edwards' motive, instead of insubordination, is

insufficient to create a genuine issue of material fact.

Finally, there is one undisputed material fact that strongly weighs against a finding

that Plaintiff has provided this court with a "convincing mosaic of circumstantial evidence"

that there was a connection between Plaintiff's reports of racially motivated graffiti and his

subsequent suspension by Edwards.  Specifically, Plaintiff believes he was retaliated against

based on his complaints about harassment based on sexual orientation—activity that is not

protected under Title VII.  This fact, even if not dispositive (which it certainly could be) on

Plaintiff's retaliation claim, certainly weighs against a finding that there is convincing

circumstantial evidence that Edwards retaliated against Plaintiff based on his complaints of **racial** harassment.

In summary, this court finds that there is insufficient circumstantial evidence for Plaintiff to prevail under the direct method.  Therefore, because the Plaintiff is unable to offer a convincing mosaic of circumstantial evidence allowing for an inference that there is a causal connection between his protected activity and the alleged adverse actions, Plaintiff fails to demonstrate a *prima facie* case of retaliation under the direct method.

## V. RACE DISCRIMINATION CLAIM

Defendant, in its Motion for Summary Judgment, argued that summary judgment in its favor was appropriate on Plaintiff's "race discrimination claim."  Defendant argues that Plaintiff has failed to satisfy the *prima facie* case because he was not meeting legitimate expectations and has failed to show that Defendant treated similarly situated employees outside of his protected class more favorably.  Additionally, Defendant argues that even if Plaintiff can make out her *prima facie* case of race discrimination, Plaintiff is unable to show that Defendants stated reasons for the adverse employment action are pretextual.

After reviewing the Plaintiff's Amended Complaint, it is not clear to this court that Plaintiff actually raised a claim that Defendant discriminated against Plaintiff based on Plaintiff's race.  Rather, it appears that Plaintiff merely alleges harassment based on both sexual orientation and race, and retaliation for protected actions related to this alleged sexual orientation and race harassment.  Additionally, Plaintiff did not attempt, and actually did not

even refer to, this argument in his Response.[11]  Therefore, this court finds that Plaintiff has

not presented evidence to this court that would form the basis for a Title VII claim based on

race discrimination by the Defendant.

IT IS THEREFORE ORDERED THAT:

(1) Plaintiff's Motion to Strike (#35) is DENIED.

(2) Defendant's Motion for Summary Judgment (#31) is GRANTED.

(3) The clerk of the court is directed to enter judgment in favor of the Defendant and

against the Plaintiff pursuant to Federal Rules of Civil Procedure 56.  This case is terminated

in its entirety.

ENTERED this 28th day of February, 2012

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE

---

[11]Plaintiff's Response (#37) made the following statement: "[t]he Complaint in this case charges workplace harassment based on sex and racial status, and retaliation for reporting the conduct."

26